UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. 4:24-CR-130 |
| v. | : | |
| | : | (C.J. BRANN) |
| ANGELO PEREYRA, | : | |
| Defendant | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

### I.    INTRODUCTION

Defendant Angelo Pereyra trafficked in human parts he stole from the hospital where he worked, most egregiously the bodies of babies who had died during childbirth, and whose parents entrusted the hospital to lay to rest properly.  Pereyra's conduct shocks the conscience.  The Sentencing Guidelines simply do not account for the egregiousness of this type of crime, and the range they yield in Pereyra's case is insufficient to establish a just sentence.

Accordingly, the United States respectfully recommends that the Court depart or vary upward from the Guidelines range and impose a sentence of imprisonment of 60 months.

1

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Angelo Pereyra was employed by Wesley Hospital in Wichita, Kansas, in the Pathology Department.  Andrew Ensanian was a resident of Montgomery, Pennsylvania, in Lycoming County, in the Middle District of Pennsylvania.  PSR ¶ 8.  The two met through eBay and communicated via Facebook Messenger.  Between May 2018 and July 2022, Pereyra stole human remains from his employer hospital and sold them to Ensanian.  PSR ¶ 9.  Pereyra shipped the human parts and fetal corpses via U.S. Post, and payment was sent electronically via PayPal.  Ensanian purchased numerous so-called "wet specimens" from Pereyra.  Facebook communications establish that Pereyra sold multiple fetal corpses to Ensanian, as well as a partial foot, a human heart, slices of liver, brain, and kidneys, a spleen, a foot, intestine pieces, a testicle, a jar of toes, skin, and fat, dried toes, and miscellaneous other organs.  PSR¶ 10, 11.  The transactions totaled over $5,000 in the aggregate.

On May 15, 2024, an Information was filed, charging Pereyra with Interstate Transportation of Stolen Goods in violation of 18 U.S.C. § 2314.  (Doc. 1).

On June 24, 2024, Pereyra pled guilty to the Information pursuant to a plea agreement with the government.  Pereyra stipulated that the offense involved a loss of $6,500 to $15,000 and agreed to make full restitution.  PSR ¶ 2.

## III.  PROCEDURE

Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), which rendered the United States Sentencing Commission Guidelines Manual ("USSG") advisory, the Court of Appeals set forth a three-step process when imposing a sentence:

1. Courts must continue to calculate a defendant's USSG sentence, regardless of *Booker*;

2. In doing so, they must formally rule on the motions of both parties, state on the record whether the Court is granting a departure and how that departure affects the USSG calculation, and consider pre-*Booker* case law, which continues to have advisory force; and

3. Courts are required to exercise their discretion by considering the relevant factors set forth in Title 18, United States Code,

Section 3553(a), when imposing a sentence, regardless of whether it varies from the sentence calculated under the USSG.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006).

Each of these steps is addressed below.

## A. Sentencing Guidelines Calculation

The government agrees with the guidelines calculation in the final Presentence Report.  (Doc. 31).  The defendant has filed no objections to the PSR.  The government further agrees with the PSR's recommendation that the unusually heinous nature of Pereyra's offenses warrant consideration of upward departure pursuant to USSG §§ 5K2.0 and 5K2.8.  PSR ¶¶ 69, 70.  As discussed more fully below, the government asks this Court to depart or vary above the otherwise applicable guidelines range and impose a term of imprisonment of 60 months.

## B. The Parties' Motions

The government respectfully moves this Court to depart above the guidelines range pursuant to two enumerated sections of the Sentencing Guidelines, § 5K2.8 and § 5K2.0.  A departure under

§ 5K2.8 is appropriate because the defendant's conduct was unusually heinous, cruel, and degrading.  A departure under § 5K2.0 is warranted because there exist circumstances relevant to determining an appropriate sentence that the Commission has not identified in the guidelines.  Alternatively, the government requests an upward variance for the same reasons.

First, the nature of this crime was especially heinous as compared to a run-of-the-mill interstate transportation of stolen goods case typically sentenced under the Guidelines.  "Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline. . . . Whether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guideline cases." *United States v. Queensborough*, 227 F.3d 149, 162 (3d Cir. 2000), quoting *Koon v. United States*, 518 U.S. 81, 98 (1996).  *See also*, United *States v. Bull*, 828 F.3d 735, 739 (8d Cir. 2016) (upward departure warranted where conduct is "outside the

heartland" of the typical case of its kind).  Nothing in § 2B1.1 accounts for the theft and sale of stolen human remains.  In a "heartland" theft case, the Court need not address the emotional toll of a victim parent whose grief over losing a child is compounded by the theft and exploitation of his mortal remains.  Nor do the Guidelines account for circumstances where the theft and ensuing interstate transportation violate the human dignity of the deceased.

The defendant and other individuals involved in the theft and interstate trade of human remains engaged in conduct far more egregious than the typical stolen goods case.  Indeed, were it not for their actions in commodifying and profiting from the sale of stolen body parts, one might be reluctant to classify such remains as "goods" at all.  But these individuals stole dead babies and parts of cadavers and turned them into "stock," buying and selling pieces of deceased people, advertising their dark wares and creating a marketplace for this sick trade.  Thus, it was their own actions in treating human remains as "goods," that require us to meet them where their conduct takes us in order to deliver justice for both the deceased and those who grieve them.

Angelo Pereyra stole people's dead children and parts of people's bodies and sold them. Patients, treated in the hospital that employed Pereyra, trusted the hospital to treat these specimens properly and respect their dignity and privacy. Pereyra violated that trust and abused his position and access for his own profit. Grieving parents, some still recovering in the hospital upstairs, were exploited when Pereyra stole the body of their lost babies from the morgue and sold them. The hospital where Pereyra worked had a practice of burying babies who died in their care in a religious ceremony. In stealing their bodies and selling them like chattels, Pereyra robbed them of that peaceful repose.

No less a victim are the individuals from whom parts were stolen and sold. Their organs, tissues, and limbs were harvested for profit and sold without their consent or the knowledge or permission of their next of kin. Any patient who lost a child at that Kansas hospital while Pereyra worked there will never be at peace, forever wondering whether their baby son or daughter are sitting on someone's mantle in a jar. People from whom samples were taken or on whom amputations were performed never gave Pereyra their permission to sell their parts,

and would likely be appalled to learn he had done so.  But Pereyra did not keep track of whose parts he stole, so any such patient who passed through that hospital may have been affected.

These are not considerations normally present in interstate transportation cases, nor accounted for in the Guidelines.

The government is unaware of any other federal theft-related case—indeed any "basic economic offense," as the Guidelines term them—previously prosecuted anywhere in the country that involved the interstate trafficking of stolen human remains.[1]  The virtually unprecedented nature of this prosecution and the offense conduct here are strong indicators that the Guidelines have not accounted for all of the aggravating circumstances present in the instant case.  There can

---

[1] The closest analogue the undersigned could find was United States v. Megan Hess and Shirley Koch, involving the Sunset Mesa Funeral Home in the District of Colorado.  Case no. 20-cr-00098.  That case was fundamentally different from this one in that here the defendants bought and sold parts and bodies for personal possession and use, and there was no legitimate purpose for them to have them.  In the Sunset Mesa case, bodies were fraudulently donated for scientific research without proper authorization from the next of kin, so that the defendants could collect a broker's fee.  *See* https://www.justice.gov/usao-co/pr/sunset-mesa-funeral-home-operators-sentenced-federal-prison-illegal-body-part-scheme for more details.

be no question that the cases arising from this investigation fall well outside the heartland of interstate transportation of stolen goods cases. "A district court may depart from the Guidelines if it finds that 'there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.'" *United States v. Prawdzik*, 484 Fed. Appx. 717, 722 (3d Cir. 2012), quoting *United States v. Stuart*, 22 F.3d 76, 82-83 (3d Cir. 1994).

Accordingly, an upward departure is necessary to arrive at a sentence sufficient, but not greater than necessary, to effectuate the goals of federal criminal sentencing.

### C. Assessment of Relevant § 3553(a) Sentencing Factors

The final step in the sentencing process is for the Court to consider all applicable factors set forth in Title 18, United States Code, § 3553(a) when fashioning an appropriate, individualized sentence. Here, a sentence of 60 months' imprisonment would meet the goals of punishment, deterrence, and potential rehabilitation.

The facts discussed above speak to the especially heinous and egregious nature and circumstances of the offense conduct in this case as well as certain characteristics of the defendant.

Also relevant is Pereyra's criminal history. Though a minor offense, Pereyra's one conviction is for Petit Theft, an opportunistic crime in which he stole something with the intent to sell it online for profit. PSR ¶ 28. Thus, he shows a pattern of conduct similar to his crime in this case.

Pereyra had a good job as a pathology assistant, earning $55,000 per year. PSR ¶ 45. He has a bachelor's degree, which he earned with honors. PSR ¶ 43. He has no history of substance abuse. PSR ¶ 39. He did not need to steal body parts and fetal corpses to make money.

Given the widespread nature of this offense, the need for deterrence is paramount. This investigation has uncovered a secretive, nationwide market for human remains, most of which are stolen. In this case, positive evidence of the thefts was uncovered, and so the perpetrators can be held accountable. But most such transactions occur in the shadows, and the sources of the remains are undisclosed. Despite knowing that "wet specimens" and fetal corpses cannot be

10

obtained legally, the down-market trade cannot be prosecuted as it is in this case without proof that the items are stolen.  Thus, it is vital that, in a case where the evidence proves conclusively that the remains were stolen, a message must be sent to this "oddities" community, that the United States does not tolerate the theft and sale of human remains. This dark trade must end.

It is no exaggeration to describe the twisted conduct in this case as a human rights violation, a desecration of societal norms and long-held human notions of right and wrong.  This practice violates the human dignity of the deceased and inflicts suffering on their loved ones.

"The notion that the bodies of the dead and their human remains deserve respect and a dignified treatment is common to and deeply embedded within different societal, religious, and cultural traditions. Legal protections governing the treatment of dead bodies have long been established within international humanitarian law, international criminal law, human rights law, and domestic laws. . . .  The treatment of dead bodies is also of concern to international criminal law, which prohibits the mutilation of the dead. Violation of the bodies of the dead is increasingly recognized as an element of crime, as an attack on

personal dignity."  United Nations Office of the High Commissioner for
Human Rights, Special Rapporteur, Apr. 25, 2024.[2]

"The protection of and respect for the dead is something that
makes us human. It's prevalent, since the beginning of humanity, in all
cultures and religions and is regulated in religious, cultural and social
practices around the world, in national laws and also in International
Humanitarian Law that applies in times of war.  The protection of the
bodies and human remains of deceased persons . . . in many cases
affects other rights of the victim and his or her family
members. . . . There are a range of rights that are affected when there is
no access to the body, when the victim's body is mutilated, destroyed,
when their dignity is not respected."  Tidball-Binz, Morris, "Protecting
and respecting the dead makes us human," July 5, 2024.[3]

"Death does not erase human dignity, either immediately or
completely. The consequences of certain acts of self-determination reach

---

[2] Available at https://www.ohchr.org/en/calls-for-input/2024/call-input-
protection-dead-persons-and-their-human-remains-including-victims,
last visited Dec. 20, 2024.
[3] Available at https://www.ohchr.org/en/stories/2024/07/protecting-and-
respecting-dead-makes-us-human, last visited Dec. 20, 2024.

beyond death, and command suitable respect. Human rights are rights accruing to the living; they protect and facilitate life itself. It is only possible to speak of rights of the dead in the sense that some acquired legal rights last beyond death, such as the right to be buried. Caring for the dead in a manner appropriate to human dignity is primarily significant for the next of kin. Denying this right means that the next of kin are prevented from making their peace with the loss of an individual who is close to them. Suitable care for the dead is thus a right of the living." German Commission for Justice and Peace, "How society cares for the dead – a matter of human dignity!" July 2024.[4]

The conduct in this case strikes to the heart of one of the quintessential human experiences – death and the grieving process. When humans die, their loved ones frequently find solace in the peace they hope we find in death. The theft and sale of these remains for profit is a violation of any notion of peace for the dead and those who love them, and shatters any sense of security they might have felt in

---

[4] Available at https://www.partner-religion-development.org/wp-content/uploads/2024/09/How-society-cares-for-the-dead-%E2%80%93-a-matter-of-human-dignity.pdf, last visited Dec. 20, 2024.

the belief that their loved ones are treated with dignity and respect in their final disposition.

In making its recommendation, the government is mindful of the relative culpability of all of the defendants who engaged in similar conduct in the cases related to Pereyra's. Several aggravating factors have led the government to assess Pereyra's culpability as somewhat higher than the median remains trafficking defendant. Pereyra abused a position where he was trusted by his employer and the hospital's patients, and exploited that trust. And Pereyra stole body parts and remains, including, most egregiously, stillborn and miscarried fetal corpses, and sold them for monetary gain. Weighing in his favor is that he admitted his guilt upon being confronted by the FBI and his trafficking was limited to a single customer.

For all of these reasons, the government recommends a term of imprisonment of 60 months, and a fine to disgorge part or all of the proceeds of the defendant's conduct.

V.    Conclusion

Accordingly, the United States respectfully requests that the

Court grant an upward departure from the otherwise applicable

Guidelines range and impose a sentence of 60 months' imprisonment.

December 23, 2024                Respectfully submitted,

                                 GERARD M. KARAM
                                 United States Attorney

                                 By: /s/ Sean A. Camoni
                                 SEAN A. CAMONI
                                 Assistant U.S. Attorney
                                 William J. Nealon Federal Building
                                 235 North Washington Avenue
                                 Scranton, Pennsylvania 18503
                                 570.348.2800

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. 4:24-CR-130 |
| v. | : | |
| | : | (C.J. BRANN) |
| ANGELO PEREYRA, | : | |
| Defendant | : | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.  That on this Monday, December 23, 2024, she served a copy of the attached

## GOVERNMENT'S SENTENCING MEMORANDUM

by electronic means to:
<u>Addressee</u>:
Gregory Watt, Esquire


Dated:  December 23, 2024            <u>s/ Terri L. Pendolphi</u>
                                     Terri L. Pendolphi
                                     Legal Administrative Specialist

16